

1  DAVID C. SHONKA
Acting General Counsel
2  K. MICHELLE GRAJALES
mgrajales@ftc.gov
3  LISA ANNE ROTHFARB
lrothfarb@ftc.gov
4  FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., NW
5  Mail Stop: CC-10232
6  Washington, DC 20580
7  (202) 326-3172
8

9  JOHN D. JACOBS, Cal. Bar No. 134154
jjacobs@ftc.gov
10  FEDERAL TRADE COMMISSION
11  10990 Wilshire Blvd., Ste. 400
Los Angeles, CA 90024
12  Tel: (310) 824-4343; Fax: (310) 824-4380
13  Attorneys for Plaintiff

14
15
16
17

18
19
20
21
22
23
24
25
26
27
28

**FILED**
CLERK, U.S. DISTRICT COURT

9/27/17

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ER_____ DEPUTY

**LODGED**
CLERK, U.S. DISTRICT COURT

9/25/17

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ER_____ DEPUTY

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

FEDERAL TRADE COMMISSION,

Plaintiff,

vs.

A1 DOCPREP INC., a corporation;
STREAM LINED MARKETING, a
corporation, also d/b/a Project Uplift
Students and Project Uplift America;
BLOOM LAW GROUP PC, a
professional corporation, also d/b/a
Home Shield Network and Keep Your
Home USA; and
HOMAN ARDALAN, individually and

Civ. No.   LA17CV07044-SJO(JCx)

**COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER
EQUITABLE RELIEF**

**FILED UNDER SEAL**

as an officer of A1 DOCPREP INC., )
and STREAM LINED MARKETING; )
                                  )
              Defendants. )
                                  )

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.     The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, and the 2009 Omnibus Appropriations Act, Public Law 111-8, Section 626, 123 Stat. 524, 678 (Mar. 11, 2009) ("Omnibus Act"), as clarified by the Credit Card Accountability Responsibility and Disclosure Act of 2009, Public Law 111-24, Section 511, 123 Stat. 1734, 1763-64 (May 22, 2009) ("Credit Card Act"), and amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111-203, Section 1097, 124 Stat. 1376, 2102-03 (July 21, 2010) ("Dodd-Frank Act"), 12 U.S.C. § 5538, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, and the Mortgage Assistance Relief Services Rule ("MARS Rule" or "Regulation O"), 12 C.F.R. Part 1015, formerly codified as 16 C.F.R. Part 322, in connection

with their deceptive marketing and sale of student loan debt relief and mortgage assistance relief services.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 6102(c), 6105(b), and Section 626 of the Omnibus Act, as clarified by Section 511 of the Credit Card Act, and amended by Section 1097 of the Dodd-Frank Act, 12 U.S.C. § 5538.

3.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.     The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices in or affecting commerce.  Pursuant to 12 U.S.C. § 5538, the FTC also enforces the MARS Rule (Regulation O), which requires mortgage assistance relief services ("MARS") providers to make certain disclosures, prohibits certain representations, and generally prohibits the collection of an advance fee.

5.     The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, the TSR, and the MARS Rule, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 56(a)(2)(A), 6102(c), 1679h(b), and § 626, 123 Stat. 678, as clarified by § 511, 123 Stat. 1763-64, and amended by § 1097, 124 Stat. 2102-03, 12 U.S.C. § 5538.

## **DEFENDANTS**

6.     Defendant A1 DocPrep Inc., ("A1") is a Wyoming corporation that is registered as a foreign corporation in California and has stated in public documents that 5455 Wilshire Blvd, Suite 201 Los Angeles, CA 90036 is its principal executive office address.  A1 was originally incorporated, and since dissolved, in Wyoming in March 2016.  A1 incorporated in California in January 2017. A1 transacts or has transacted business in this district and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, or as part of the common enterprise described in paragraph 10,  A1 has advertised, marketed, offered to provide,  sold, or provided student loan debt relief services and mortgage assistance relief services to consumers throughout the United States.

7.      Defendant Stream Lined Marketing ("Stream Lined") is a Wyoming corporation that has stated in public documents that 21900 Burbank Blvd., Woodland Hills, CA 91317 is its principal address. Stream Lined incorporated in California in November 2012 and in Wyoming in October 2016. Stream Lined transacts or has transacted business in this district and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, or as part of the common enterprise described in paragraph 10,  Stream Lined has advertised, marketed, offered to provide, sold, or provided student loan debt relief services and mortgage assistance relief services to consumers throughout the United States.

8.      Defendant Bloom Law Group P.C. ("Bloom Law") is a California professional corporation that has stated in public documents that 21900 Burbank Blvd., Woodland Hills, CA 91317 is its principal executive office and principal business office.  Bloom Law transacts or has transacted business in this district and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, or as part of the common enterprise described in paragraph 10,  Bloom Law has advertised, marketed, offered to provide, sold, or provided student loan debt relief services and mortgage assistance relief services to consumers throughout the United States.

9.     Defendant Homan Ardalan ("Ardalan") is the CEO, Secretary, and CFO of A1, and has been the CEO, Secretary, CFO, Director, and Registered Agent of Stream Lined until at least January 2017.  Ardalan registered several websites associated with the practices alleged in this complaint, including but not limited to A1docprep.com, Projectupliftstudents.org, Projectupliftamerica.org, Thebloomlawgroup.com, Keepyourhomeusa.org, Rodeolawgroup.com, Westfieldlawgroup.com, and Homeshieldnetwork.org.  Ardalan is a signatory on A1, Stream Lined, and Bloom Law Group's depository bank accounts.  Ardalan obtained A1's merchant account for processing credit card payments and serves as the company contact for A1 and Bloom Law Group's telecommunications.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of A1, Stream Lined, and Bloom Law Group, including the acts and practices set forth in this Complaint.  Ardalan resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

10.     Defendants A1, Stream Lined, and Bloom Law Group (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged below. Defendants have conducted the business practices described below through an

interrelated network of companies that have common ownership or managers, and that have commingled funds. For example, Ardalan controls funds in each of the corporate defendants' bank accounts, and bank records show consistent, substantial payments from both A1 and Bloom Law Group accounts to Stream Lined's corporate account. Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below. Defendant Ardalan has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

## **COMMERCE**

11.    At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act,15 U.S.C. § 44.

## **DEFENDANTS' DECEPTIVE STUDENT LOAN DEBT RELIEF AND MORTGAGE ASSISTANCE RELIEF OPERATION**

12.    Since at least May 2016, Defendants have operated an unlawful debt relief enterprise that preys on consumers with student loan debt. Defendants have lured consumers with text messages and telephone calls that falsely purport to be from the U.S. Department of Education ("ED") offering time-limited participation in forgiveness programs. Defendants promise to reduce consumers' monthly

payments and eliminate all or a portion of their student loan debt through enrollment in student loan forgiveness or income-driven repayment programs.  In many instances, however, consumers have discovered that Defendants failed to obtain  debt forgiveness or monthly payment reductions.  In fact, some consumers have owed more on their student loans after enrolling in Defendants' program.

13.     Since at least October 2015, Defendants also have operated a similar scheme in which they market mortgage assistance relief services to financially distressed homeowners.  Defendants claim that they have a very high success rate, including, in some instances, that they have a 98% success rate, in obtaining mortgage loan modifications and preventing foreclosures, and that consumers will receive expert legal representation.  In numerous instances, however, Defendants fail to obtain the promised loan modifications and do not provide any legal representation to consumers.  In some instances, consumers' homes have been foreclosed after consumers signed up for Defendants' assistance with their mortgages.

14.     In exchange for the promised student loan debt relief and mortgage assistance relief services, Defendants have charged illegal upfront fees of as much as $4,500.

## Background on Student Loan Forgiveness and Repayment Programs

15.     Student loan debt is the second largest class of consumer debt; more than 42 million Americans collectively owe nearly $1.3 trillion.  The student loan market shows elevated levels of distress relative to other types of consumer debt.

16.     To address this mounting level of distressed debt, ED and state government agencies administer a limited number of student loan forgiveness and discharge programs.  Most consumers, however, are not eligible for these programs because of strict eligibility requirements.  For example, one program requires the consumer to demonstrate a total and permanent disability; another applies only to consumers whose school closed while the consumer was still enrolled.  A third program, the Borrower Defense to Repayment ("BDR"), may provide a loan discharge if the school, through an act or omission, violated state law directly related to the borrower's federal student loan or to the educational services for which the loan was provided.

17.     Other forgiveness programs require working in certain professions for a period of years.  Teacher Loan Forgiveness applies to teachers who have worked full-time for five years in a low-income elementary or secondary school or educational service agency.  Public Service Loan Forgiveness ("PSLF") applies to employees of governmental units or non-profit organizations who make timely monthly payments for a period of ten years while employed in the public sector.

18.     The federal government also offers loan forgiveness through income-driven repayment ("IDR") programs that enable borrowers to reduce their monthly payments and have portions of their loans forgiven.  No loans have been forgiven yet under any of the IDR programs.  IDR programs allow eligible borrowers to limit their monthly payments based on a percentage of their discretionary monthly income.  To remain in an IDR program, borrowers must recertify their income and family size annually.  Obtaining forgiveness through IDR programs requires a minimum of 20 or 25 years of qualifying payments.

19.     Because a borrower's income is likely to fluctuate over the life of the loan, monthly payments under the IDR programs can vary considerably from year to year. If a borrower's income were to increase over the repayment period, for example, the monthly payment amount could correspondingly increase to the point where those payments would pay off the loan before any amount could be forgiven at the end of the repayment term.

20.     Consumers can apply for BDR, PSLF, IDR, and other loan repayment and forgiveness or discharge programs through ED or their student loan servicers at no cost; these programs do not require the assistance of a third-party company or payment of application fees.

21.     ED will grant forbearance while processing applications for an alternative repayment plan, and in some cases of hardship.  During forbearance, unpaid interest is added to the principal balance.

22.     Both private financial institutions and the federal government fund student loans. The William D. Ford Federal Direct Loans Program ("Direct Loans") is the largest "federal" loan program, one where the lender is the U.S. Department of Education, as opposed to a private bank or lender.

**Defendants' Deceptive Marketing of Student Loan Debt Relief Services**

23.     To lure consumers into purchasing their purported student loan debt relief services, Defendants have engaged in two unlawful practices, making: (1) false claims that they are or are affiliated with the federal government, including the Department of Education; and (2) false promises to eliminate or reduce consumers' student loan balances or monthly payments through loan forgiveness or other programs.

24.     Defendants make outbound telemarketing calls and send texts to consumers to offer their services and convince student loan borrowers to sign up with the company. In some instances, consumers view the Defendants' website or online advertising and call Defendants' telemarketers for more information.

25.     Defendants have claimed to be the Department of Education in their advertisements.  For example, Defendants have left the following telephone message on consumers' phones:

This message is from the Department of Education.  In regards to Donald Trump becoming President, all programs for student loan forgiveness will be stopped immediately as soon as he takes office in January.  In order for you to qualify, you must apply within the next 24 hours or you will not be able to have your student loan payment reduced.  Please contact us at [toll free number].  The number again is [toll free number].  Once again, you must get involved within the next 24 hours.  Thank you.

26.     Defendants have also falsely represented to consumers that they are affiliated with Direct Loans.  For example, one of Defendants' email communications to one consumer bears the header: "William D. Ford Federal Direcr (sic) Loans."

27.     Contrary to Defendants' representations, Defendants are not the Department of Education or vetted, approved, or affiliated with the federal government or any government program.

28.     Defendants have also sent text messages to consumers that typically promote the benefits of loan forgiveness and invoke false and urgent warnings that

a consumer's opportunity to obtain loan forgiveness is about to expire, for

example:

> Your student loans may be completely forgiven if they
>
> meet the guidelines- Find out in minutes.  Call 888-339-
>
> 7142 or Reply STOP to opt-out

and

> Your Student loan may be forgiven today, but Donald
>
> Trump may stop that call now at 888-307-0680 Reply
>
> STOP to opt-out

29.     In numerous instances, Defendants have described themselves as

being or being affiliated with non-profit student advocacy organizations.

Defendants have operated a website that bolsters their student advocacy

representations at projectupliftstudents.org.  Under the heading "Why We Do It,"

this website states "We believe many Americans are unable to pay thier (sic)

student loans and still be able to afford to live their lives comfortably.  That is the

sole reason this organization was founded to put an end to your student loan

nightmare and finally have you placed in a payment that is affordable to you."

30.     Defendants also have operated a website at A1docprep.com where

they purport to provide "Document Preparation and Consulting services to

consumers who are seeking to consolidate their Federal Student Loans into one loan and enroll into an affordable and manageable monthly payment."

31.     In calls with consumers, Defendants' telemarketers have told consumers that Defendants can reduce loan balances, or that consumers' loan balances would be forgiven after making lower monthly payments.  For example, Defendants stated during a recorded call with an undercover investigator with $40,000 in student loan debts that "you're going to pay back $21,019.20 and you're going to be forgiven for the rest."  Some consumers were told that over half their loan balance would be forgiven.

32.     In many instances, Defendants have failed to obtain the promised lower monthly payments or student loan forgiveness.

33.     In numerous instances, Defendants have represented that the payments for their services were "installments."  For example, in one recorded telephone call Defendants stated: "Now, your first five installments, we spread into five different months consecutively for $300.  After that, you're going to drop down to $82.58 for the remainder of your term."  Consumers typically understood that their payments would go towards their student loans.

34.     In fact, Defendants do not apply the initial monthly "installments" to consumers' student loans; rather, these initial payments, typically for the first three to five months, are kept as fees for Defendants' services.

35.     Defendants have charged consumers fees for purported debt relief services before achieving any results, and, in many instances, have failed to achieve any results at all on behalf of the consumers.  Defendants' total advance fees have typically been in the range of $900-$1,500.  Defendants' telemarketers typically have obtained consumers' payment information on the initial phone call.

36.     In many instances, Defendants have e-mailed consumers a link to a contract to sign electronically.  Defendants typically have pressured consumers into quickly electronically signing the contract while the telemarketer is still on the phone.  Buried in the contract document is language at odds with the statements in Defendants' advertisements and telephone communications with consumers: "Client understands and acknowledges the fact that A1DocPrep is only a document preparation company and is in no way guaranteeing or promising consolidation;" and "A1 DocPrep is NOT affiliated in any manner with the Department of Education or any other academic or governmental entity."  In many instances, consumers were rushed through the contract and did not read the above language. In those instances where consumers read and asked Defendants about the contract's statements that A1 is not the Department of Education, Defendants provided multiple reassurances over the telephone. In other instances, consumers did not sign the contract and discovered later that Defendants had signed their name electronically.

37.     In some instances, when consumers have contacted Defendants to cancel their enrollment in Defendants' program, Defendants have told consumers that they could suffer adverse credit consequences if they cancel. In many instances, Defendants have refused or ignored requests for refunds by consumers.

**Defendants' False Promises to Provide Mortgage Assistance Relief**

38.     Defendants also have made false promises to obtain mortgage loan modifications for consumers through advertisements on websites and telephone calls to consumers.

39.     For example, the home page of one of Defendants' websites, keepyourhomeusa.org, has listed a number of mortgage assistance relief benefits under "What We Have Achieved":

- Principle (sic) Balance Reduction

- Past Payment Forgiveness

- Capitalization of Arrears

- 2% Interest Rates

- House Free And Clear

- Settlements

This homepage has further stated: "Contact Us For a Free Consultation." The website does not disclose that Keep Your Home USA "is not associated with the government, and their service is not approved by the government or your

-16-

lender," nor does the website state "Even if you accept this offer and use our service, your lender may not agree to change your loan."

40.     Defendants have conducted outbound telephone calls to consumers using the business names of "Home Shield Network," "Keep Your Home USA," or "Legal Network Group."

41.     Defendants have typically referred consumers to one of several purported law firms, including Bloom Law Group, using statements such as "they are really good at getting clients loan modifications," and "they have a 98% success rate for modifications."

42.     In numerous instances, Defendants have falsely stated that they worked for a government program or a "state funded program."  For example, Defendants' representative stated in a call with one consumer that "he would not get paid for anything for referring [the consumer to Bloom Law Group] because he was an advocate for the state."

43.     In numerous instances, Defendants have stated they would obtain a loan modification for consumers, help consumers stay in their homes, and lower their mortgage payments.

44.     In numerous instances, Defendants have told consumers not to communicate with their mortgage servicer and to refer any calls from their servicer to Bloom Law Group.

45.   In numerous instances, Defendants' representatives from "Home Shield Network" or other purported public assistance programs have instructed consumers they must pay a fee by cashier's check, typically $900, to Bloom Law Group before Bloom Law Group will send any retainer agreement or paperwork to the consumer.  During these consumer-specific commercial communications, Defendants have not provided any of the following disclosures: (1)  "You may stop doing business with us at any time.  You may accept or reject the offer of mortgage assistance we obtain from your lender [or servicer].  If you reject the offer, you do not have to pay us [insert amount or method of calculating amount] for our services;" (2)  "[Company] is not associated with the government, and our service is not approved by the government or your lender;" (3) "Even if you accept this offer and use our service, your lender may not agree to change your loan;"  and (4) "If you stop paying your mortgage, you could lose your home and damage your credit."

46.   Defendants have operated a website at thebloomlawgroup.com that states "Bloom Law Group assists homeowners in their struggle against predatory mortgage lending and wrongful foreclosures."  This website has promoted a "Litigation Preparation Program" where "a homeowner can get relief through a change in interest rate and/or principal balance."  This website does not include the disclosure that Defendants are "not associated with the government, and our

service is not approved by the government or your lender," nor does the website state "Even if you accept this offer and use our service, your lender may not agree to change your loan."

47.     Defendants typically have had a purported paralegal from Bloom Law Group contact consumers and email them a "Litigation Preparation Program Package" containing several documents, including an "Attorney-Client Pro Bono Legal Agreement."

48.     Despite the "pro bono" attorney client legal agreement, over the next several months, the "Home Shield Network," "Keep Your Home USA," or "Legal Network Group" representative that originally referred the consumer to Bloom Law Group has typically contacted the consumer and claimed it was time for the consumer to make an additional payment to Bloom Law Group.  Defendants typically collect a total of approximately $4,500 in fees, spread over several monthly payments.

49.     In numerous instances, Defendants have requested or received payment of fees before the consumer has executed a written agreement with the consumer's dwelling loan holder or servicer that incorporates the offer of mortgage assistance relief Defendants obtained, if at all, from the consumer's dwelling loan holder or servicer.

50.     In numerous instances, consumers who enrolled with Bloom Law Group have never spoken or met with an attorney.  All correspondence from the Bloom Law Group is typically signed by the same purported attorney, who is not barred in or licensed to practice in most consumers' various states of residence.

51.     In numerous instances, Defendants have failed to obtain a loan modification, principal reduction, or other relief to stop foreclosure or make consumers' mortgage payments affordable.  In some instances, Defendants have changed the contact information for consumers with their lenders, thereby preventing consumers from receiving critical foreclosure notices.  Some consumers have lost their homes in foreclosure after enrolling with Defendants.

**Defendants' Unlawful Calls to Consumers on the National**

**Do Not Call Registry**

52.     In numerous instances, Defendants have placed over 150,000 outbound telemarketing calls to consumers who are listed on the National Do Not Call Registry.  Defendants have placed such calls to area codes without paying the required annual fee for access to the telephone numbers within that area code that are included in the National Do Not Call Registry.

**THE FTC ACT**

53.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

54.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## VIOLATIONS OF THE FTC ACT

### Count I

### Deceptive Student Loan Debt Relief Representations

55.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of student loan debt relief services, Defendants have represented, directly or indirectly, expressly or by implication that:

      a.    Defendants are part of or affiliated with the government, government loan programs, or the Department of Education; and

      b.    Consumers who purchase Defendants' debt relief services generally will have their monthly payments reduced or their loan balances forgiven in whole or in part.

56.    In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 55 of this Complaint, such representations were false or not substantiated at the time Defendants made them.

57.    Therefore, Defendants' representations as set forth in Paragraph 55 of this Complaint are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count II

### Deceptive Mortgage Assistance Relief Representations

58.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of mortgage assistance relief services, Defendants have represented, directly or indirectly, expressly or by implication that:

    a.  Defendants are part of or affiliated with the government, or government programs; and

    b.   Defendants would generally obtain a loan modification for consumers that would make their payments substantially more affordable or help them avoid foreclosure.

59.    In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 58 of this Complaint, such representations were false or not substantiated at the time Defendants made them.

60.    Therefore, the making of the representations as set forth in Paragraph 58 of this Complaint constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### THE TELEMARKETING SALES RULE

61.    Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15

U.S.C. §§ 6101-6108.  The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter.  16 C.F.R. Part 310.

62.     Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).  A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to a customer in exchange for consideration.  16 C.F.R. § 310.2(dd).  A "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor.  16 C.F.R. § 310.2(ff). "Telemarketing" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call.  16 C.F.R. § 310.2(gg).

63.     Defendants are sellers or telemarketers of "debt relief services" as defined by the TSR, 16 C.F.R. § 310.2(o).  Under the TSR, a "debt relief service" means any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors, including, but not

limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector.  16 C.F.R. § 310.2(o).

64.    The TSR prohibits sellers and telemarketers from requesting or receiving payment of any fees or consideration for any debt relief service until and unless:

    a.    The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and

    b.    The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor; and

    c.    To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either:

        i.    Bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount.  The individual debt

amount and the entire debt amount are those owed at the

time the debt was enrolled in the service; or

ii.    Is a percentage of the amount saved as a result of the

renegotiation, settlement, reduction, or alteration.  The

percentage charged cannot change from one individual

debt to another.  The amount saved is the difference

between the amount owed at the time the debt was

enrolled in the service and the amount actually paid to

satisfy the debt.  16 C.F.R. § 310.4(a)(5)(i).

65.    The TSR prohibits sellers and telemarketers from misrepresenting directly or by implication a seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity.  16 C.F.R. § 310.3(a)(2)(vii).

66.    The TSR prohibits sellers and telemarketers from misrepresenting directly or by implication, any material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using the service.  16 C.F.R. § 310.3(a)(2)(x).

67.    The TSR prohibits sellers and telemarketers from initiating or causing others to initiate outbound telephone calls to consumers who have registered their

telephone numbers on the National Do Not Call Registry.  16 C.F.R. §
310.4(b)(1)(iii)(B).

68.	The FTC allows sellers, telemarketers, and other permitted
organizations to access the National Do Not Call Registry over the Internet at
telemarketing.donotcall.gov, to pay the fee(s) if required by the TSR, and to
download a list of numbers that are prohibited from being called.

69.	The TSR prohibits sellers and telemarketers from calling any
telephone number within a given area code unless the seller on whose behalf the
call is made has paid the annual fee for access to the telephone numbers within that
area code that are included in the National Do Not Call Registry.  16 C.F.R. §
310.8.

70.	Consumers who receive telemarketing calls to their registered
numbers can complain of National Do Not Call Registry violations the same way
they registered, through a toll-free telephone call or over the Internet at
donotcall.gov, or by otherwise contacting law enforcement authorities.

71.	Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. §
6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of
the TSR constitutes an unfair or deceptive act or practice in or affecting commerce,
in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

### Count III

### Advance Fee for Debt Relief Services

72.     In numerous instances, in connection with the telemarketing of student loan debt relief services, Defendants have requested or received payment of a fee or consideration for debt relief services before:

a.     Defendants have renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and

b.     The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor.

73.     Defendants' acts or practices, as described in Paragraph 72 of this Complaint, are abusive telemarketing acts or practices that violate Section 310.4(a)(5)(i) of the TSR, 16 C.F.R. § 310.4(a)(5)(i).

### Count IV

### Misrepresentation of Affiliation

74.     In numerous instances, in connection with the telemarketing of student loan debt relief services, Defendants have misrepresented, directly or

indirectly, expressly or by implication, that they are affiliated with, or endorsed or sponsored by, the government, government loan programs, or the Department of Education.

75.     Defendants' acts and practices, as described in Paragraph 74 of this Complaint, are deceptive telemarketing acts or practices that violate Section 310.3(a)(2)(vii) of the TSR, 16 C.F.R. § 310.3(a)(2)(vii).

## Count V

## Material Debt Relief Misrepresentations

76.     In numerous instances, in connection with the telemarketing of student loan debt relief services, Defendants have misrepresented, directly or indirectly, expressly or by implication, material aspects of their debt relief services, including, but not limited to that consumers who purchase Defendants' debt relief services generally will have their monthly payments reduced or their loan balances forgiven in whole or in part.

77.     Defendants' acts and practices, as described in Paragraph 76 of this Complaint, are deceptive telemarketing acts or practices that violate Section 310.3(a)(2)(x) of the TSR, 16 C.F.R. § 310.3(a)(2)(x).

## Count VI

## Calls in Violation of

## National Do Not Call Registry

78.     In connection with telemarketing, Defendants initiated or caused others to initiate numerous outbound telephone calls to consumers who have registered their telephone numbers on the National Do Not Call Registry in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B).

## Count VII

## Failure to Pay Required Fee for Access to

## National Do Not Call Registry

79.     In connection with telemarketing, Defendants initiated or caused others to initiate numerous outbound telephone calls to telephone numbers within a given area code when Defendants had not, either directly or through another person, paid the required annual fee for access to the telephone numbers within that area code that are included in the National Do Not Call Registry in violation of the TSR, 16 C.F.R. § 310.8.

## THE MORTGAGE ASSISTANCE RELIEF SERVICES RULE

80.     In 2009, Congress directed the FTC to prescribe rules prohibiting unfair or deceptive acts or practices with respect to mortgage loans.  Omnibus Act, § 626, 123 Stat. 678, as clarified by Credit Card Act, § 511, 123 Stat. 1763-64. Pursuant to that direction, the FTC promulgated the MARS Rule, 16 C.F.R. Part 322, all but one of the provisions of which became effective on December 29, 2010.  Title X of the Dodd-Frank Act, 124 Stat. 1376, transferred the FTC's

rulemaking authority under the Omnibus Act, as amended, to the Consumer Financial Protection Bureau ("CFPB").  On December 16, 2011, the CFPB republished the MARS Rule as Regulation O, 12 C.F.R. Part 1015.  Plaintiff includes citations to the former codification for ease of reference.

81.    The MARS Rule defines "mortgage assistance relief service provider" as "any person that provides, offers to provide, or arranges for others to provide, any mortgage assistance relief service" other than the dwelling loan holder, the servicer of a dwelling loan, or any agent or contractor of such individual or entity. 12 C.F.R. § 1015.2, formerly codified as 16 C.F.R. § 322.2.

82.    Since January 31, 2011, the MARS Rule has prohibited any mortgage assistance relief service provider from requesting or receiving payment of any fee or other consideration until the consumer has executed a written agreement between the consumer and the consumer's loan holder or servicer that incorporates the offer that the provider obtained from the loan holder or servicer.  12 C.F.R. § 1015.5(a), formerly codified as 16 C.F.R. § 322.5(a).

83.    The MARS Rule prohibits any mortgage assistance relief service provider from representing, expressly or by implication, in connection with the advertising, marketing, promotion, offering for sale, sale, or performance of any mortgage assistance relief service, that a consumer cannot or should not contact or

communicate with his or her lender or servicer.  12 C.F.R. § 1015.3(a), formerly codified as 16 C.F.R. § 322.3(a).

84.     The MARS Rule prohibits any mortgage assistance relief service provider from misrepresenting, expressly or by implication, any material aspect of any mortgage assistance relief service, including but not limited to:

    a.     the likelihood of negotiating, obtaining, or arranging any represented service or result.  12 C.F.R. § 1015.3(b)(1), formerly codified as 16 C.F.R. § 322.3(b)(1); and

    b.     that a mortgage assistance relief service is affiliated with, endorsed or approved by, or otherwise associated with any Federal, State, or local government agency, unit, or department.  12 C.F.R. § 1015.3(b)(3)(iii), formerly codified as 16 C.F.R. § 322.3(b)(3)(iii).

85.     The MARS Rule prohibits any mortgage assistance relief service provider from failing to place a statement in every general commercial communication disclosing that (i) the provider is not associated with the government and its service is not approved by the government or any lender, and (ii) in certain cases, a statement disclosing that the lender may not agree to modify a loan, even if the consumer uses the provider's service.  12 C.F.R. §§ 1015.4(a)(1)-(2), formerly codified as 16 C.F.R. §§ 322.4(a)(1)-(2).

86.     The MARS Rule prohibits any mortgage assistance relief service provider from failing to place a statement in every consumer-specific commercial communication (i) confirming that the consumer may stop doing business with the provider or reject an offer of mortgage assistance without having to pay for the services, (ii) disclosing that the provider is not associated with the government and its service is not approved by the government or any lender, and (iii) in certain cases, a statement disclosing that the lender may not agree to modify a loan, even if the consumer uses the provider's service, and  (iv) in certain cases, a statement disclosing that if they stop paying their mortgage, consumers may lose their home or damage their credit.  12 C.F.R. §§ 1015.4(b)(1)-(3) and (c); formerly codified as 16 C.F.R. §§ 322.4(b)(1)-(3) and (c).

87.     Pursuant to the Omnibus Act, § 626, 123 Stat. 678, as clarified by the Credit Card Act, § 511, 123 Stat. 1763-64 and amended by the Dodd-Frank Act, § 1097, 124 Stat. 2102-03, 12 U.S.C. § 5538, and pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the MARS Rule (Regulation O) constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE MARS RULE

### Count VIII

### Advance Payment for MARS

88.    In numerous instances, in the course of providing, offering to provide, or arranging for others to provide mortgage assistance relief services, Defendants ask for or receive payment before consumers have executed a written agreement between the consumer and the loan holder or servicer that incorporates the offer obtained by Defendants, in violation of the MARS Rule (Regulation O), 12 C.F.R. § 1015.5(a).

### Count IX

### Prohibited Representations

89.    In numerous instances, in the course of providing, offering to provide, or arranging for others to provide mortgage assistance relief services, Defendants, in violation of the MARS Rule (Regulation O), 12 C.F.R. § 1015.3(a), have represented, expressly or by implication, that a consumer cannot or should not contact or communicate with his or her lender or servicer.

### Count X

### Material MARS Misrepresentations

90.    In numerous instances, in the course of providing, offering to provide, or arranging for others to provide mortgage assistance relief services, Defendants,

in violation of the MARS Rule (Regulation O), 12 C.F.R. § 1015.3(b)(1)-(4), have misrepresented, expressly or by implication, material aspects of their services, including, but not limited to:

    a.    Defendants' likelihood of obtaining mortgage loan modifications for consumers that will make their payments substantially more affordable; and

    b.    Defendants are affiliated with, endorsed or approved by, or otherwise associated with:

        i.    the United States government,

        ii.    any governmental homeowner assistance plan,

        iii.    any Federal, State, or local government agency, unit, or department,

        iv.    any non-profit housing counselor agency or program,

        v.    the maker, holder, or servicer of the consumer's dwelling loan, or

        vi.    any other individual, entity, or program.

## Count XI

### Failure to Disclose

91.     In numerous instances, in the course of providing, offering to provide, or arranging for others to provide mortgage assistance relief services, Defendants have failed to make the following disclosures:

a.      in all general commercial communications –

i.      "[Name of Company] is not associated with the government, and our service is not approved by the government or your lender," in violation of the MARS Rule (Regulation O), 12 C.F.R. § 1015.4(a)(1); and

ii.     "Even if you accept this offer and use our service, your lender may not agree to change your loan," in violation of the MARS Rule (Regulation O), 12 C.F.R. § 1015.4(a)(2);

b.      in all consumer-specific commercial communications –

i.      "You may stop doing business with us at any time.  You may accept or reject the offer of mortgage assistance we obtain from your lender [or servicer].  If you reject the offer, you do not have to pay us.  If you accept the offer, you will have to pay us [insert amount or method for

calculating the amount] for our services," in violation of the MARS Rule (Regulation O), 12 C.F.R. § 1015.4(b)(1);

ii.   "[Name of company] is not associated with the government, and our service is not approved by the government or your lender," in violation of the MARS Rule (Regulation O), 12 C.F.R. § 1015.4(b)(2);

iii.   "Even if you accept this offer and use our service, your lender may not agree to change your loan," in violation of the MARS Rule (Regulation O), 12 C.F.R. § 1015.4(b)(3); and

iv.   "If you stop paying your mortgage, you could lose your home and damage your credit," in violation of the MARS Rule (Regulation O), 12 C.F.R. § 1015.4(c).

## **CONSUMER INJURY**

92.   Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, and the MARS Rule.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are

likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

### THIS COURT'S POWER TO GRANT RELIEF

93.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations  of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

94.     Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b) and Section 626 of the Omnibus Act authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR and the MARS Rule, including the rescission or reformation of contracts, and the refund of money.

### PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. §§ 53(b) and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, requests that the Court:

A.     Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to a temporary and preliminary injunction, asset freeze, appointment of a receiver, an evidence preservation order, and expedited discovery.

B.     Enter a permanent injunction to prevent future violations of the FTC Act, the TSR, and the MARS Rule by Defendants;

C.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, the TSR, and the MARS Rule, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.     Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated: _9 / 25 / _____, 2017


Respectfully submitted,
DAVID C. SHONKA
Acting General Counsel


*K. Michelle Grajales*
K. Michelle Grajales
Lisa Anne Rothfarb
John D. Jacobs
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION